# DECLARATION

I, Glen Sakamura, pursuant to Title 28, United States Code, Section 1746, under penalty of perjury, and pursuant to the laws of the United States, state that the following information is true and correct to the best of my knowledge, information, and belief:

1. I am an investigative law enforcement officer of the United States within the meaning of 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18. In May 2023, I became a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA). I am currently assigned to the DEA, Atlanta Field Division, Greensboro District Office.

2. In 2012, I completed Basic Law Enforcement Training. In February 2013, I joined the Randolph County Sheriff's Office (RCSO) as a deputy sheriff and was assigned as a desk officer. In October 2013, I was assigned to RCSO Patrol Division where my duties as a patrol officer consisted of responding to service calls, writing reports, and investigating various misdemeanor and felony offenses. In December 2014, I was assigned to the RCSO Vice/Narcotics Unit. I conducted numerous undercover and controlled buys. I have prepared and assisted in the execution of numerous search warrants. I am knowledgeable in the identification and collection of controlled substances and stolen property. In January 2017, I was reassigned to the Patrol Division as a senior patrol officer. In March 2019, I was reassigned to the RCSO Vice/Narcotics Unit as a detective with the multi-agency Task Force.

GOVERNMENT
EXHIBIT
A

3. I have received extensive training in investigating crimes and the collection and preservation of evidence. I am a certified Division of Criminal Information Operator and Field Training Officer. I have completed numerous hours of training related to criminal investigations and law enforcement techniques, including narcotics interdiction.

4. I have participated in hundreds of cases that involved the violation of state and federal laws that govern controlled substances and related crimes. Through my training and investigative experience, I have gained significant knowledge in the field of drug law enforcement. I have learned the techniques and methods utilized by drug traffickers in negotiating, procuring, packing, financing, and distributing illegal drugs. I am familiar with the methods drug traffickers use to maintain records of their trafficking, and the methods they utilize to launder and conceal the proceeds from the sale of illegal controlled substances.

5. This Declaration is submitted in support of a Verified Complaint of Forfeiture for $30,000.00 in U.S. Currency seized on May 28, 2024, from Shamari Anshun TAYLOR in Archdale, North Carolina.

6. The facts and circumstances set forth in this Declaration are based upon information provided by other law enforcement officers and my own personal knowledge and experience. Since this Declaration is being submitted for a limited purpose, I am not including all the facts and information which I have learned about or obtained during the course of this investigation.

7. Based on the investigation described below, there is probable cause to believe that the $30,000.00 in U.S. Currency is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 21 U.S.C. § 881(a)(6).

8. On May 28, 2024, RCSO Detective K. Gabby was working on Interstate 85 as part of a Highway Criminal Interdiction Taskforce between the RSCO and the High Point Police Department. At approximately 8:40 a.m., Detective Gabby was notified by RCSO Sergeant T. Short that he was attempting to catch up to a black Dodge Challenger that was traveling north on I-85 in Randolph County, North Carolina. Sergeant Short advised the members of the task force that the Dodge Challenger had a temporary South Carolina registration plate and dark window tint on the windshield and side glass that he suspected to be illegal.

9. Detective Gabby spotted the subject vehicle in his rearview mirror leaving Randolph County and positioned his patrol vehicle behind the subject vehicle to conduct a traffic stop. The driver of the subject vehicle exited to the right shoulder of I-85 and came to a complete stop. Detective Gabby was in the process of entering his traffic stop when he observed furtive movement from inside the subject vehicle. Detective Gabby observed the driver leaning and reaching into the right rear seating area as if attempting to hide something. These movements raised Detective Gabby's suspicions that the driver might be concealing a weapon or illegal contraband.

10. Detective Gabby exited his patrol vehicle and approached the passenger side of the Dodge Challenger. Detective Gabby identified the driver and sole occupant of the vehicle as Shamari Anshun TAYLOR. Detective Gabby explained to TAYLOR that he

3

stopped him due to suspected unlawful window tint, and requested TAYLOR'S driver license. TAYLOR stated that he did not have a driver license with him, but knew his license number. Detective Gabby later determined that TAYLOR's North Carolina driver license status was suspended. TAYLOR was not able to provide documentation for the vehicle. Detective Gabby observed that the temporary South Carolina license plate was missing the vehicle's vehicle identification number and issuance date that a dealership normally would hand write on the plate. Based on the circumstances, Detective Gabby suspected that the vehicle was possibly stolen. Detective Gabby requested TAYLOR to exit his vehicle and be seated in his patrol vehicle.

11. In the patrol vehicle, Detective Gabby interviewed and ran a search on TAYLOR. Detective Gabby learned that TAYLOR was on probation out of Wake County, North Carolina, based on a 2023 conviction for an attempt to break or enter a motor vehicle and possession of stolen goods or property. Detective Gabby also learned that the Dodge Challenger had on expired registration out of North Carolina, not South Carolina as indicted on the temporary tag. Detective Gabby exited his vehicle and tested the front driver's window of the Dodge Challenger with a tint meter. The window tint tested at 4.4 percent and therefore was unlawful. Detective Gabby issued a warning citation to TAYLOR for various driving violations that he found during the traffic stop.

12. Detective Gabby explained to TAYLOR that he intended to perform a weapons frisk on the passenger area of the vehicle and requested TAYLOR's consent for the search. TAYLOR gave his consent. Detective Gabby asked TAYLOR if there were any guns in the vehicle. TAYLOR stated there were not any guns in the vehicle. While

4

searching, Detective Gabby observed numerous rubber bands in the front console. From his training and experience, Detective Gabby knows that drug traffickers often use rubber bands in the process of transporting U.S. Currency proceeds from illegal drug sales. Detective Gabby did not find any weapons in the passenger area of the vehicle.

13. Officer Detective Gabby asked TAYLOR about the trunk of the Dodge Challenger and requested consent to search it. TAYLOR immediately had a change in his demeanor. TAYLOR initially consented to a search of the trunk, but then revoked consent. TAYLOR asked why his trunk needed to be checked and advised that he only had clothes in the trunk. TAYLOR pleaded to be let go because he was trying to make it to a court hearing in Raleigh, North Carolina. Law enforcement later determined that TAYLOR's court date in Raleigh was not until the following day.

14. Sergeant Short spoke to TAYLOR about his active probation and the condition of probation requiring a probationer to submit to warrantless searches by a law enforcement officer of the probationer's person and vehicle upon a reasonable suspicion that the probationer is engaged in criminal activity or is in possession of a firearm, explosive device, or other deadly weapon without written permission of the court. Detective Gabby again asked TAYLOR if there were any guns in the vehicle. TAYLOR denied having a gun in the vehicle. Detective Gabby proceeded with a search of the trunk.

15. Immediately upon opening the trunk, Detective Gabby located a Mossberg MC20c 9mm handgun sitting on top of a gym bag. Detective Gabby detained TAYLOR and continued searching the trunk. Detective Gabby located a black and gray shoulder bag in the front right area of the trunk. The bag was filled with bulk U.S. Currency most of

5

which was rubber banded together and organized in denominations of $20 and $100 bills. In my training and experience, the manner in which the U.S. Currency was organized and packaged is consistent with the way proceeds of drug trafficking are packaged.

16. When law enforcement asked TAYLOR about the U.S. Currency, TAYLOR stated that it was his life savings. TAYLOR also stated that the U.S. Currency was for a number of several things, his child's birthday, his own allowance from his mother, and repairs to his vehicle. TAYLOR later stated that the U.S. Currency was earnings from riding as a passenger for his brother's trucking business.

17. Detective Gabby requested Sergeant Short utilize his narcotics detecting police canine, K-9 Gunny, to conduct a free-air sniff around the exterior of the Dodge Challenger.

18. Sergeant Short deployed K-9 Gunny around the Dodge Challenger. K-9 Gunny displayed a positive alert and sat in the area of the driver's side b-pillar, that is the pillar between the front and rear side windows, thereby alerting to the odor of narcotics coming from the vehicle.

19. Sergeant Short has been a sworn law enforcement officer in the State of North Carolina for 9 years. Sergeant Short has received hundreds of hours of instructions and training in narcotics enforcement, narcotics related investigations, criminal/drug interdiction and legal updates while attending basic, intermediate, and advanced level classes. Sergeant Short has initiated and/or assisted in hundreds of narcotics related investigations and has initiated and/or supervised numerous investigations leading to the arrest and conviction of narcotics users, street level narcotics dealers, and narcotics

traffickers. Sergeant Short also frequently consults various periodicals to stay informed about current trends utilized by narcotics traffickers, including advanced narcotics concealment and packing methods. In April 2019, Sergeant Short was selected by the RCSO to be a police canine handler. Sergeant Short was assigned to handle K-9 Gunny in August of 2019, and was assigned to the Criminal Interdiction Team, with the focus of conducting criminal interdiction along major roadways in Randolph County, North Carolina. Sergeant Short and K-9 Gunny are currently certified narcotics detection team through the National Narcotic Detector Dog Association (NNDDA) and remain on the Criminal Interdiction Team. Sergeant Short has attended numerous seminars and other training opportunities which have exposed him to the basic and advanced narcotic concealment methods, narcotics detection issues, and animal behavior.

20. Sergeant Short has successfully demonstrated the ability to properly deploy and maintain a police narcotics K-9 and, with the assistance of K-9 Gunny, effectively locate controlled substances that have been concealed in locations such as sealed packing, wooden crates, residential homes, open areas, automobiles, and commercial motor vehicles. Sergeant Short and K-9 Gunny are credited with locating numerous pounds of illegal narcotics and over $500,000.00 in bulk U.S. Currency while conducting criminal interdiction investigations and assisting with various local, state, and federal narcotics investigations.

21. K-9 Gunny is a male German Shepherd, a breed specifically selected for their keen senses and ability to be trained to detect the odor of controlled substances. K-9 Gunny initially underwent several weeks of initial training at High Point Canine Solutions LLC

7

training facility. During this training period, K-9 Gunny proved that he could reliably use his olfactory senses to locate narcotic training aids of actual controlled substances which include marijuana, heroin, cocaine, methamphetamines, and MDMA (3,4-methylenedioxymethamphetamine). After successful completion of this training, K-9 Gunny was entered into service with the RCSO Special Operations Division Criminal Interdiction Team as a narcotics detection canine.

22. K-9 Gunny is trained to passively alert after detecting the odor of narcotics for which he has been trained. This passive alert consists of a physical reaction which ultimately ends in him coming to a sitting and/or laying position when the odor of narcotics for which he is trained is detected. K-9 Gunny also exhibits various physical reactions which are noticeable to Sergeant Short which include changes in his behavior such as becoming possessive of the area, a refusal to leave an area where the odor of narcotics is detected, and changes in her breathing rate, sniffing patterns, and body posture.

23. Sergeant Short and K-9 Gunny were certified as a Narcotics Detection Team by the NNDDA in the detection of marijuana, cocaine, heroin, and methamphetamines on July 6, 2021. Sergeant Short and K-9 Gunny certify annually with the NNDDA, the most recent certification occurring in February 2024 and March 2025. K-9 Gunny undergoes frequent training for the detection of concealed controlled substances to ensure his proficiency.

24. I instructed Detective Gabby to transport the vehicle, including the U.S. Currency in the vehicle, as well as TAYLOR to the Archdale Police Department for further investigation.

25. Upon arrival to Archdale Police Department, Detective Gabby utilized three clean paper bags to set up a blind canine stiff of the U.S. Currency. The U.S. Currency was placed in one of three bags, which location was unknown to Sergeant Short. Sergeant Short then deployed K-9 Gunny upon the three bags. K-9 Gunny sat next to the paper bag containing the seized U.S. Currency, thereby alerting to the presence of the odor of narcotics.

26. I and other DEA TFOs met with TAYLOR and advised him of his Miranda rights. TAYLOR verbally waived his Miranda rights, and law enforcement conducted a brief interview. During the interview, TAYLOR advised that he was employed by his brother and helps out with his brother's trucking business. TAYLOR advised that his brother's business was called "Stenson's Trucking." TAYLOR described the business as a local transportation service that utilizes box trucks and tractor trailers. I questioned TAYLOR about the types of haulers his brother utilized for the business. TAYLOR stated that his brother's business uses dump trucks, which I know are significantly different from box trucks and tractor trailers. Thus, TAYLOR's statements regarding his employment appeared to me to be inconsistent, and gave me the impression that TAYLOR was being untruthful and did not have legitimate employment at a trucking company. TAYLOR advised that he has worked off and on for the past two years and is paid $800.00 to $1,000.00 dollars cash under the table every week. I subsequently queried the North Carolina Secretary of State website to try and locate TAYLOR's supposed employer, "Stenson's Trucking." I was unable to locate any business registered as Stenson's Trucking.

27. When law enforcement asked him about the bulk U.S. Currency found in the trunk of the Dodge Challenger, TAYLOR initially advised that it was a couple thousand dollars. When questioned again about the amount, TAYLOR stated that it was not $2,000.00 dollars, it was in fact more than that. TAYLOR then advised that the money was his life savings from college to present. When law enforcement asked TAYLOR how much money his life savings was, he advised it was either $10,000.00, $15,000.00, $20,000.00, or $30,000.00. TAYLOR stated that he was unsure of the exact amount because he would take money out every now and then. TAYLOR's apparent ignorance of the appropriate amount of his supposed life savings, and the wide range of estimated dollar amounts, was suspicious and led me to believe that the U.S. Currency did not actually belong to TAYLOR. When asked why he had the money with him, TAYLOR advised that he was planning on getting his car fixed, and he was going to help his "baby mama" and family financially if they needed it. When asked what he was going to fix on his car he stated that his windshield needed to be fixed, and that the was going to get a body wrap and new wheels put on his car.

28. After discussing the bulk of U.S. Currency, TAYLOR was then asked about the firearm that was located in his car. TAYLOR advised that the gun belongs to his "homeboy" who TAYLOR declined to identify. TAYLOR then stated that he did not care about the firearm and that officers could have it. Through past investigations, it has been found to be a common practice for narcotics traffickers to conceal narcotics and proceeds from the distribution of narcotics with a firearm in close vicinity to discourage theft.

10

Case 1:25-cv-00357-UA-JLW    Document 1-1    Filed 05/08/25    Page 10 of 12

29. Law enforcement then requested TAYLOR consent to a search of his mobile phones. TAYLOR consented to the search of his phones. During the consent search, I observed a contact in TAYLOR's phone as "Plugg." Through my training and experience, I know that narcotics traffickers commonly refer to their narcotics supplier as a "Plug." When asked who Plugg was, TAYLOR advised that it was a female companion of his. After locating the contact information for Plugg, I continued to look through TAYLOR's conversation with Plugg and found a photograph that TAYLOR had sent to Plugg of himself with a large amount of U.S. Currency in his lap. I noted that the timestamp on the photograph was in October 2023, approximately 8 months prior.

30. TAYLOR was advised that the U.S. Currency and the Mossberg MC20c 9mm handgun were being seized and he was given a copy of an inventory sheet for the items seized. TAYLOR was then released.

31. Law enforcement subsequently transported the U.S. Currency to Bank of America in Raleigh, North Carolina, where it was counted again and converted into a check in the amount of $30,000.00, made payable to the United States Marshal Service. The check was then provided to the United States Marshal Service, which deposited the check into its Seized Asset Deposit Fund Account.

32. A search of law enforcement databases indicates that TAYLOR does not have a previous history of criminal drug convictions.

33. DEA adopted the seizure of $30,000.00 in U.S. Currency and began administrative forfeiture proceedings. Notice of the forfeiture proceeding was posted on

the Internet at www.forfeiture.gov for a period of 30 days commencing on September 4, 2024, and ending on October 4, 2024.

34. On August 28, 2024, DEA received a claim to the $30,000.00 in U.S. Currency from TAYLOR. TAYLOR claims that the currency was from the sales and purchases from Manhattan Jewelers, personal loans, and his savings account. This explanation is not entirely consistent with TAYLOR's previous statements to law enforcement regarding the source of the U.S. Currency.

35. Upon receipt of the claim, DEA terminated the administrative forfeiture process and referred the service of U.S. Currency to the United States Attorney's Office for judicial forfeiture.

## CONCLUSION

36. Based on the foregoing, there is probable cause to believe that the $30,000.00 in U.S. Currency was furnished or intended to be furnished in exchange for a controlled substance, in violation of the Controlled Substances Act, 21 U.S.C. §§ 801, et seq., or represents proceeds traceable to such an exchange, or was used or intended to be used to facilitate violation of the Controlled Substances Act, and is therefore subject to seizure and forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 21 U.S.C § 881(a)(6).

This the 7th day of May, 2025.

*[signature]*
Glen Sakamura
Task Force Officer
Drug Enforcement Administration